# EXHIBIT A

**Medi-Corp, Inc.**

**and**

**Francu One LLC**

## BILLING SERVICES AGREEMENT

This Agreement is made and entered into this 1st_day of December 2008 by and between Medi-Corp, Inc., a New Jersey corporation ("MEDI-CORP") and Francu One LLC. a MD corporation ("CLIENT").

1. **Definitions.**

1.1. Anesthesia Service Information. Anesthesia Service Information shall mean the data elements identified in Exhibit B, attached hereto.

1.2. Anesthesia Services. Anesthesia Services shall mean services provided by anesthesiologists and CRNAs employed by CLIENT.

1.3. Charge Schedule. The Charge Schedule shall mean the schedule of charges used to bill Payors, as identified in Exhibit C, attached hereto.

1.4. Commencement Date. Commencement Date shall mean the date on which this Agreement commences, as defined in Subsection 6.1.

1.5. Confidential Information. Confidential Information shall mean all information, data, statistics, records, reports, correspondence, contracts, and similar items (including, without limitation, patient, business, and financial information, data, statistics, records, reports, correspondence and contracts), in whatever form, furnished by CLIENT or retained or generated by MEDI-CORP in the performance of its responsibilities under this Agreement.

1.6. Delinquent Accounts. Delinquent Accounts shall mean accounts billed and remaining unpaid, with no activity, for more than ninety (90) days.

1.7. EIN. EIN shall mean the Employer Identification Number assigned to a corporation by the Internal Revenue Service for tax reporting purposes.

1.8. Gross Receipts. Gross Receipts shall have the meaning described in Exhibit A, Subsection 2.

1.9. Parties. The Parties shall mean MEDI-CORP and CLIENT, and each shall be a Party.

1.10. Patient Information. Patient Information shall mean the data elements identified in Exhibit D, attached hereto.

1.11. Payor. Payor shall mean the person or entity responsible for payment of Anesthesia Services and shall include, without limitation, patients, guarantors, insurers, health care institutions, Medicare and Medicaid.

1.12. MEDI-CORP. MEDI-CORP shall mean Medi-Corp, Inc., a New Jersey corporation.

1.13. MEDI CORP Monthly Invoice. MEDI-CORP Monthly Invoice shall mean the invoice generated by MEDI-CORP each month to document compensation due from CLIENT for billing services rendered under this Agreement.

1.14. CLIENT. CLIENT shall mean Francu One LLC a MD corporation.

1.15. Termination Date. Termination Date shall mean the date on which this Agreement terminates, as described in Subsection 6.1.

2. **Appointment.** CLIENT hereby retains MEDI-CORP as its agent to bill and collect for Anesthesia Services; and MEDI-CORP agrees to serve as such agent in accordance with the terms and conditions hereinafter set forth. In no event shall MEDI-CORP have any control over or responsibility for the establishment or determination of the fees charged by CLIENT.

3. **Obligations of MEDI-CORP.** With respect to Anesthesia Services, MEDI-CORP agrees to the following:

3.1. To code all Anesthesia Services provided by CLIENT and generate an initial bill, claim or statement of account to the appropriate Payor on behalf of CLIENT after receiving the following information:

3.1.1. Anesthesia Service Information, which shall be deemed complete when the data elements listed in Exhibit B, attached hereto, are received.

3.1.2. Charge Schedule, which shall be deemed complete when the data elements described in Exhibit C, attached hereto, are received.

3.1.3. Patient Information, which shall deemed complete when the data elements listed in Exhibit D, attached hereto, are received.

3.2. To provide at MEDI-CORP's expense all equipment, hardware, software, materials, supplies and all billing and output forms necessary or appropriate for the processing and billing of charges for Anesthesia Services.

3.3. To maintain, at the offices of MEDI-CORP and at the expense of MEDI-CORP, persons who shall be responsible for Anesthesia Services billing by MEDI-CORP, including but not limited to, (i) acceptance on a regular basis of completed Patient Information, Anesthesia Service Information, and Charge Schedule data and (ii) diligent acquisition of other information as is necessary to permit effective billing.

3.4. To discharge its billing functions in good faith, with reasonable care, at all times in the name of CLIENT.

3.5. To direct all Payors to send all payments for Anesthesia Services directly to the CLIENT account described in Subsection 5.4.

3.6. To record all payments made to the CLIENT; and to compute and post all contractual adjustments on payments received from Payors, provided that CLIENT provides documentation of the contractual adjustment.

3.7. To apply all payment information to the appropriate patient account and to generate an itemized statement of account for a patient or Payor, upon a request from such patient or Payor.

3.8. To follow billing and collection procedures set by CLIENT from time to time for accounts remaining unpaid for more than ninety (90) days ("Delinquent Accounts"), including without limitation:

3.8.1. To record as "bad debt" those balances up to $24.99 within thirty (30) days following the generation of the third (3rd) bill, letter or statement of account.

3.8.1.1. "Bad debt" refers to uncollected amounts that may be sent to a collection agency.

3.8.2. To transfer to a collection agency of CLIENT's choice those patient accounts that have balances of twenty-five dollars ($25) or over that remain unpaid thirty (30) days following the generation of the third (3rd) bill, letter or statement of account; provided, however, that MEDI-CORP may continue following those patient accounts for which payment is reasonably expected upon resolution of a dispute as to liability or amount of payment, including, without limitation, an internal insurance company review process, arbitration, mediation and a judicial proceeding.

3.8.3. To adjust patient accounts as directed by CLIENT in writing, e.g., to suspend or terminate billing, dunning, or collection procedures.

3.9. To report in writing to CLIENT with respect to the prior month's operations, billing and collection activity, including completed billings, gross collections in the CLIENT lock-box, refunds given, contractual adjustments made, accounts recorded as "uncollectible/administrative write-off," and outstanding receivables.

3.10. To propose policy standards for billing and collection where a need for change is perceived.

3.11. To provide regular training and compliance seminars to CLIENT staff by experienced employees of MEDI-CORP so that such staff are knowledgeable in the methods and procedures required for MEDI-CORP to effect proper billing and collection.

3.12. To submit MEDI-CORP Monthly Invoices to CLIENT in accordance with Exhibit A, attached hereto.

3.13. To maintain and comply with at all times during the course of this Agreement a compliance plan that is effective and consistent with the standards set forth in the U.S. Sentencing Guidelines and the Department of Health and Human Services ("HHS") Office of Inspector General's Compliance Program Guidance for Third-Party Medical Billing Companies.

3.14. To provide a staffed nationwide toll-free telephone number to answer patient or Payor inquiries about billing or collections from 10:00 a.m. to 4:00 p.m. EST Monday through Friday, excluding MEDI-CORP holidays.

4. **Responsibilities not assumed by MEDI CORP.** In providing billing services, MEDI-CORP shall not be responsible for the following:

4.1. Amounts unpaid by Payors who have been sent bills, claims, or statements of account in accordance with Subsections 3.8 and 3.9.

5. **Obligations of CLIENT.** CLIENT agrees to the following:

5.1. To compensate MEDI-CORP in accordance with Exhibit A, attached hereto, within ten (10) days of receipt of the MEDI-CORP Monthly Invoice.

5.2. To supply MEDI-CORP, electronically (such as by File Transfer Protocol or facsimile) or by hard copy delivered to MEDI-CORP's New Jersey office, the Patient Information, Anesthesia Service Information, and Charge Schedule information necessary for MEDI-CORP to perform its billing services.

5.3. To assist MEDI-CORP in researching missing data required to generate a bill, claim or statement of account and in appealing claims denied for lack of medical necessity.

5.4. To deposit cash or checks received in CLIENT offices for Anesthesia Services into the CLIENT account.

5.5. To establish the Charge Schedule and provide regular updates of the Charge Schedule to MEDI-CORP; and to provide MEDI-CORP with documentation of adjustments to the Charge Schedule.

5.6. To assign a CLIENT staff member to act as the primary liaison with MEDI-CORP.

5.7. To make its staff available at all reasonable times and places for training by MEDI-CORP in the methods and procedures required for proper billing.

5.8. To comply with all pertinent provisions of federal and state laws and regulations with respect to Anesthesia Services performed under this Agreement.

6. **Term and Termination.**

6.1. Term. The term of this Agreement shall be for two years commencing December 1, 2008 (the "Commencement Date"). This Agreement will automatically be renewed for a one-year term without the written consent of the Parties, unless notified 60 days in advance of the termination date. The termination date ("Termination Date") shall be the last day of the annual term beginning on the anniversary of the Commencement Date, unless earlier terminated in accordance with Subsection 6.2 , in which case the Termination Date shall be the last day of the applicable notice period in Subsection 6.2 , respectively.

6.2. Termination for cause. This Agreement may be terminated by either Party for a material breach of the terms of this Agreement.

6.2.1. The Party seeking to terminate this Agreement shall first notify the other Party in writing that it considers the other Party to be in material breach of the Agreement. That notice, in order to be effective, shall set forth in specific detail, the provision(s) of the Agreement which it considers to have been breached and shall, in addition, specify the act or omissions which the breaching Party has committed or failed to perform.

6.2.2. The Party declared to be in material breach shall have thirty (30) days from the date of receipt of notice to cure said breach provided that if the nature of the material breach is such that it cannot be cured within thirty (30) days, then the Party declared to be in material breach shall have such time as is reasonably necessary to cure said material breach; provided, however, that such Party commences to cure said material breach as reasonably as possible after receipt of notice and proceeds to cure such material breach with due diligence. The right to cure will not apply to any subsequent breach.

6.2.2.1. If the Party declared to be in material breach fails to cure in accordance with Subsection 6.2.2, then the Agreement will terminate.

6.2.3. Post-Termination Collection. At termination, MEDI-CORP shall continue to make collection efforts on bills, claims and statements of account submitted prior to the Termination Date in accordance with all the terms of this Agreement as if the Agreement were still in full force. MEDI-CORP shall receive compensation for its billing and collection efforts as specified in Subsection 5.1 and Exhibit A, for four (4) months following the Termination Date, MEDI-CORP shall then cease collection efforts and return to CLIENT all data in accordance with Subsection 8.3. MEDI-CORP shall receive no further compensation from CLIENT after payment of the final invoice submitted by MEDI-CORP at the end of said four (4) months following the Termination Date.

6.3. Data Transfer Fee. In the event of the expiration, non-renewal or termination of this Agreement, with respect to CLIENT'S request for an export file of any data retained by MEDI-CORP pursuant to this Billing Services Agreement, MEDI-CORP

shall receive compensation for such requested services as further provided in Subsections 6.3.1. and 6.3.2.

6.3.1. Flat Fee. To the extent that CLIENT's request is limited to the form and format of the data export file produced by MEDI-CORP's billing software, without programming or reprogramming services, MEDI-CORP shall receive a flat fee of $500 Dollars for such requested service.

6.3.2. Programming Charges. In the event CLIENT requests a modification to the form or format of the data export file from that described in Subsection 6.3.1., in addition to the flat fee provided under Subsection 6.3.1., MEDI-CORP shall receive compensation for the programming and/or reprogramming services and/or expenses to complete the requested modification at $ 150.00 / Hour.

7. **Access to Books and Records.**

7.1. Until the expiration of four (4) years after the furnishing of any service pursuant to this Agreement, MEDI-CORP shall make available upon the written request of the Secretary of HHS or the Controller General of the U.S., or any of their duly authorized representatives, copies of this Agreement and any books, documents, records, and other data of MEDI-CORP that are necessary to certify the nature and extent of cost incurred by CLIENT for such services.

8. **Confidentiality and Ownership of Data.**

8.1. All information, data, statistics, records, reports, correspondence, contracts, and similar items (including, without limitation, patient, business, and financial information, data, statistics, records, reports, correspondence and contracts), in whatever form, furnished by CLIENT or retained or generated by MEDI-CORP in the performance of its responsibilities under this Agreement shall be considered Confidential Information, shall at all times remain the sole property of CLIENT, and shall be held in confidence and safekeeping by MEDI-CORP for the sole use of the Parties to accomplish the purposes set forth in this Agreement.

8.2. The Parties shall comply with all federal and state laws governing the confidentiality and privacy of health information, including without limitation HIPAA.

8.2.1. Transaction and Code Set Standards. Effective October 16, 2002 (or such later date specified by statute or regulation regarding transaction and code set standards under HIPAA), MEDI-CORP makes the following representations and warranties concerning items of hardware, software, and firmware used by MEDI-CORP in providing services hereunder or sold, leased, or otherwise made available to CLIENT by MEDI-CORP in connection with services hereunder:

8.2.1.1. **Internal Systems.** MEDI-CORP has evaluated its internal information systems, application software, and infrastructure (collectively, the "System") and determined that the System will process and exchange information in connection with financial and administrative health care activities in conformance with the transaction and code set standards set forth in 45 C.F.R. Parts 160 and 162 on or before October 16, 2002 (or such later date specified by statute or regulation regarding transaction and code set standards under HIPAA). MEDI-CORP has required its suppliers of its internal information systems, application software, and infrastructure and its subcontractors and service providers to resolve any compliance failures and ensure a detailed implementation plan for its products and services in order to achieve compliance with the transaction and code set standards set forth in 45 C.F.R. Parts 160 and 162 in a timely manner.

8.2.1.2. **Products for Sale.** MEDI-CORP has evaluated the products whether already installed, currently for sale, or in development, and has determined that they will process and exchange information in connection with financial and administrative health care activities in conformance with the transaction and code set standards set forth in 45 C.F.R. Parts 160 and 162 on or before October 16, 2002 (or such later date specified by statute or regulation regarding transaction and code set standards under HIPAA). For those products that do not currently process and exchange information in connection with financial and administrative activities related to health care in conformance with the transaction and code set standards set forth in 45 C.F.R. Parts 160 and 162, MEDI-CORP has developed or is currently developing upgrades that will allow the affected systems to operate with full functionality on or before October 16, 2002 (or such later date specified by statute or regulation regarding transaction and code set standards under HIPAA).

8.2.2. Privacy and Confidentiality.

8.2.2.1. The parties acknowledge that in carrying out its obligations under this Agreement, MEDI-CORP and its subcontractors, employees, affiliates, agents, or representatives may have reason to access electronic medical records and patient information maintained by CLIENT ("Patient Information").

8.2.2.2. Effective April 14, 2003 (or such later date specified by statute or regulation regarding privacy and confidentiality under HIPAA), MEDI-CORP warrants that MEDI-CORP, its subcontractors, employees, affiliates, agents, and representatives (i) shall use or disclose individually identifiable health information contained in the Patient Information only in

connection with its providing services hereunder; (ii) shall not use or disclose individually identifiable health information contained in the Patient Information other than as permitted or required by this Agreement or by law; (iii) shall not use or disclose individually identifiable health information contained in the Patient Information in any manner that violates applicable federal and state laws; (iv) shall use appropriate safeguards to protect the confidentiality of individually identifiable health information contained in the Patient Information; and (iv) shall immediately notify CLIENT in the event MEDI-CORP becomes aware of any use or disclosure of any individually identifiable health information contained in the Patient Information which violates the terms and conditions of this Agreement or applicable federal and state laws.

8.2.2.3. In the event that MEDI-CORP is ordered to disclose Patient Information pursuant to a judicial or governmental request, requirement or order, MEDI-CORP immediately shall notify CLIENT and take reasonable steps to assist CLIENT in contesting such request, requirement or order or otherwise protecting CLIENT's rights or the rights of the individual who is the subject of the Patient Information.

8.2.2.4. MEDI-CORP shall permit CLIENT and the Department of Health and Human Services and other regulatory and accreditation authorities to audit MEDI-CORP's books and records at reasonable times as they pertain to the use and disclosure of the Patient Information in order to ensure that MEDI-CORP is in compliance with the requirements of this Agreement and HIPAA, as applicable. If CLIENT informs MEDI-CORP of any modification to Patient Information maintained by MEDI-CORP, MEDI-CORP promptly shall make any such modification to the Patient Information.

8.2.2.5. Effective April 14, 2003 (or such later date specified by statute or regulation regarding privacy and confidentiality under HIPAA), MEDI-CORP shall track all disclosures of individually identifiable health information contained in the Patient Information to third parties, including MEDI-CORP's agents, subcontractors, affiliates, and representatives, other than disclosures to the individual that is the subject of the disclosed information or for purposes of payment, treatment, or health care operations (as such terms are defined in 42 C.F.R. Part 164), and at CLIENT's request MEDI-CORP shall provide an accounting of all such disclosures for the six (6) year period prior to the request.

8.2.2.6. Effective April 14, 2003 (or such later date specified by statute or regulation regarding privacy and confidentiality under

HIPAA), at the request of CLIENT, MEDI-CORP shall make any Patient Information specified by CLIENT available to the individual who is the subject of the Patient Information within the time period reasonably specified by CLIENT in the form or format requested by the individual, to the extent readily producible in such form or format, or, if not readily producible in such form or format, in such other form or format agreed to by the individual. In order to facilitate the timely provision of access to the requested Patient Information to the individual, CLIENT, or at CLIENT's request, MEDI-CORP, shall arrange with the individual the mailing of a copy of the requested Patient Information to the individual or a convenient time and place agreed to by MEDI-CORP for the individual to inspect or obtain a copy of the Patient Information.

8.2.2.7. If MEDI-CORP is required to disclose to a third party or allow a third party to access any Patient Information in order that the third party may assist MEDI-CORP or perform on behalf of MEDI-CORP a business function or activity of MEDI-CORP, MEDI-CORP shall require the third party to agree in writing to comply with the requirements set forth in this Agreement.

8.2.2.8. Upon termination of this Agreement, and after all fees owed to MEDI-CORP by CLIENT are paid, MEDI-CORP shall, at CLIENT's direction, destroy or return the Patient Information to CLIENT unless CLIENT agrees in writing that MEDI-CORP may retain the Patient Information. In the event MEDI-CORP retains Patient Information after termination of this Agreement, the provisions of this Section shall continue in full force and effect; provided, however, that MEDI-CORP may use and disclose Patient Information retained by MEDI-CORP after termination of this Agreement only for those purposes authorized by CLIENT in writing.

8.3. Upon termination of this Agreement, and after all fees owed to MEDI-CORP by CLIENT are paid, except as otherwise provided, MEDI-CORP shall promptly deliver to CLIENT all paper documents relating to CLIENT's accounts. MEDI-CORP shall deliver said CLIENT documents, at CLIENT's expense, to the offices of CLIENT.

9. **Notices.** All notices under this Agreement shall be in writing by certified mail, return receipt requested, postage prepaid, and

in the case of MEDI-CORP, sent to:

President
Medi-Corp, Inc.
25 Commerce Drive, 2nd Floor
Cranford, NJ 07016

and in the case of CLIENT, sent to:

Francu One LLC
Tudor Francu, MD
8905 Sherbrook Court
Owings, MD 20736

10. **Independent Contractor.** Nothing contained in this Agreement shall be construed as establishing a partnership or joint venture between CLIENT and MEDI-CORP, it being intended that MEDI-CORP shall be an independent contractor responsible for its own actions.

11. **Limitation on Authority.** The Parties expressly agree that MEDI-CORP shall not represent itself as the agent of CLIENT except as provided in this Agreement and that MEDI-CORP has no authority to negotiate, amend, terminate, or represent the interests of CLIENT in any contractual relationship, including without limitation, contracts with insurers and managed care providers, except as specifically authorized in writing by CLIENT.

12. **Waiver of Subrogation.** MEDI-CORP hereby grants to CLIENT, and CLIENT hereby grants to MEDI-CORP, on behalf of any insurer providing insurance required by this Agreement, a waiver of any right of subrogation any such insurer may acquire against CLIENT or MEDI-CORP by virtue of payment of any loss under such insurance.

13. **Compliance with Laws.** Any provision of applicable statutes and regulations that invalidates any term of this Agreement, that is inconsistent with any term of this Agreement, or that would cause performance hereunder by one or both of the Parties to be in violation of law shall be deemed to have superseded the terms of this Agreement; provided, however, that the Parties shall use their best efforts to accommodate the terms and intent of this Agreement to the greatest extent possible consistent with the requirements of applicable statues and regulations and negotiate in good faith toward amendment of this Agreement.

14. **Jurisdiction.** This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of New Jersey.

15. **Disputes.** CLIENT and the MEDI-CORP President or his/her designee shall attempt to resolve disputes over compensation paid to MEDI-CORP. Until the dispute is resolved, amounts in dispute shall be removed from payments owed to MEDI-CORP. Prior to filing a claim in court, the Parties agree to submit any dispute that cannot be resolved by them to a mutually agreeable mediator who shall have up to sixty (60) days to attempt to resolve the matter.

16. **Merger, Amendment.** This Agreement, together with the Exhibits attached hereto, embodies the entire agreement of the Parties with respect to the subject matter hereof and supersedes all other understandings and agreements between the Parties with respect to such subject matter. This Agreement may not be changed orally but only in writing duly executed by an authorized representative of each Party.

17. **Successors.** This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

18. **Waiver of Breach.** Failure to insist upon strict compliance with any of the terms, covenants or conditions hereof shall not be deemed a waiver thereof, nor shall any waiver of any right or power hereunder at any time be deemed a waiver of such right or power at any other time or times.

19. **Severability.** If any terms or provisions of this Agreement shall be declared invalid, void or illegal for any reason by a court of competent jurisdiction, the validity of the remainder of this Agreement shall not thereby be adversely affected and shall remain in full force and effect.

20. **Intent of the Parties.** It is not the intent of the Parties that any payments made under this Agreement be in return for the referral of ongoing business, if any, or in return for the purchasing, leasing, or ordering of services other than the specific services described in this Agreement. All payments specified in this Agreement are consistent with what the Parties reasonably believe to be fair market value for the services provided.

21. **Use of Names and Logos.** Except as otherwise permitted in this Agreement, neither Party shall use the other's name, logo or corporate identity for any purpose without the prior written consent of the Party whose name, logo or corporate identity is to be used.

22. **Titles.** Titles or captions to portions of this Agreement or to paragraphs, are for the purposes of information and guidance only and are not part of this Agreement and, shall in no way be deemed to limit the effect of any language to which they refer.

23. **Copies.** This Agreement shall be executed in one or more counterparts, each of which is to be treated as an original.

IN WITNESS WHEREOF, the Parties hereto have hereunto set their respective hands and seals all as of the day and year first above written.

Agreed to:
Medi-Corp, Inc.

[signature]

By: David Kadish, President

Date: 11/12/08

Francu One LLC.

[signature]

By: Tudor Francu, MD

Date: 11/09/08

# EXHIBIT A

## Compensation To MEDI-CORP

CLIENT shall pay MEDI-CORP in accordance with the terms of this Exhibit A as compensation in full for the services MEDI-CORP performs under this Agreement.

1. Compensation for services performed by MEDI-CORP under this Agreement shall be (_5___%) of Gross Receipts for the month immediately preceding the date of the MEDI-CORP Monthly Invoice.

2. Gross Receipts are payments deposited to the CLIENT account in the preceding month for Anesthesia Services billed to Payors or paid to group via center during any preceding month, except that Gross Receipts shall not include the following and refunds:

   a. Funds collected by a collection agency, except for payments received for an account within ten (10) days after transferring that account to the collection agency;
   b. Contractual adjustments (e.g., percentage discounts to the Charge Schedule) applicable to Gross Receipts during the preceding month;
   c. Administrative write-off and bad debt amounts.

# EXHIBIT B

## Anesthesia Service Information

A completed copy of the anesthesia services record, including the following required data elements:

1. Date(s) and time(s) of services.

2. Name(s) of medical personnel involved with service: anesthesiologist, CRNA.

3. Medical problem(s): description of medical problem and circumstances surrounding injury or illness; diagnosis code; procedure code (if applicable); condition code (if applicable).

4. Dictations for all Evaluation and Management cases.

5. Op notes for all anesthesia procedures performed.

**EXHIBIT C**

**Charge Schedule**

The Charge Schedule indicates a charge per Anesthesia Services, as follows:

1. Standard charges.

2. Contractual adjustments to be applied to the standard charge (if applicable to the particular Payor).

3. Copy of all managed care contracts (updated as they are modified or extended).

4. Spreadsheet of all conversion factors and flat fees as set forth in managed care contracts.

# EXHIBIT D

## Patient Information

1. Back and front of patient's insurance card.
2. Patient name, address (including zip code), and telephone number
3. Patient date of birth
4. Patient gender
5. Patient marital status
6. Patient social security number (unless the patient lacks one or refuses to provide it)
7. Information on a contact person (if applicable): name, address, telephone number, and relationship to patient
   - 7.1. If patient is a minor, information on parent or guardian.
8. Referring physician: name, city and UPIN.
9. Primary Payor Information
   - 9.1. Primary Payor Name: insurance company (e.g., health, auto, workers' compensation); Medicare; Medicaid; private guarantor; or other.
   - 9.2. Primary Payor's address and telephone number
   - 9.3. Primary Payor's payment identifier: insurer policy number and subscriber name; Medicare number; Medicaid number; or other.
   - 9.4. Relationship of patient to insured (if applicable)
   - 9.5. Authorization required by Primary Payor (if applicable)
10. Secondary Payor Information (if applicable)
    - 10.1. Secondary Payor Name: insurance company (e.g., health, auto, workers' compensation); Medicare; Medicaid; private guarantor; or other.
    - 10.2. Secondary Payor's address and telephone number
    - 10.3. Secondary Payor's payment identifier: insurer policy number and subscriber name; Medicare number; Medicaid number; or other.
    - 10.4. Relationship of patient to insured (if applicable)
    - 10.5. Authorization required by Secondary Payor (if applicable)
11. Medicare Advanced Beneficiary Notice, where appropriate (if patient is covered by Medicare and is capable of and willing to sign it).

## EXHIBIT E

GROUP SPECIAL BILLING INSTRUCTIONS TO MEDI-CORP, INC.

The following billing instructions are MEDI-CORP's standard billing procedure with additions and deletions as submitted by [__Francu One LLC.__] ("CLIENT") and accepted by Medi-Corp, Inc. ("MEDI-CORP"). Any future additions or deletions to these special instructions shall be submitted by CLIENT and, upon acceptance by MEDI-CORP, shall be effective as of the date of acceptance or such other date designated.

CLIENT acknowledges that it understands and agrees to MEDI-CORP's standard billing policy as written below, with the following exceptions and additions, which are submitted by CLIENT to MEDI-CORP as changes to MEDI-CORP's standard billing policy.

1. Flat fees for private insurance and private pay patients shall be as marked:
   ___✓___ The complete ASA Relative Value Guide Base Units.
   ______ ASA Relative Value Guide Base Units, except for those changes shown on the attached sheet initialed and marked by CLIENT and accepted by MEDI-CORP.
   ______ The complete Medicare RBRVS.
   ______ Other.

2. Bill patient for differences in charges and private insurance UCR payments unless CLIENT has written contract with insurance company to the contrary.

3. Do not accept changes for billing sheets over the telephone. All changes must be in writing and initialed by the physician that performed the services.

4. CLIENT will not provide discounts to other individuals other than by way of a low-income policy which would allow CLIENT, under limited circumstances, to discount fees to individuals that qualify for special consideration under the low-income policy and to patients with treatment complications. CLIENT will use the following low income policy as marked:

   ______CLIENT will use hospital's low-income policy and decisions for determining when low income discounts or write-offs are to be given.
   ______CLIENT will use its own low-income policy a copy of which is attached hereto.

   If CLIENT marks billing sheets to give discounts, MEDI-CORP shall accept this as certification by CLIENT that patient meets CLIENT's low-income policy.

5. MEDI-CORP shall bill Medicare and Medicaid claims in accordance with Medicare and Medicaid guidelines.

6. CLIENT's charge per unit shall be as follows, if fee schedule is based on ASA Relative Value Guide:

   $__90__ per unit.

EXECUTED THIS 09 day of November, 2008

Francu One LLC.

By: ______________________________

ACCEPTED THIS 12 day of Nov, 2008

Medi-Corp, Inc.

By: ______________________________

David Kadish, President